Page 417-0945. Robert Wolfe, 15 years, no military service. Counsel may proceed. Mr. Sorda, did you and Mr. Wirtz leave the building last night? We stayed in the same room. Well, Ken says that we did, but at my age I can't really remember. That reminds me, yesterday one of the topics was Groundhog Day, and so I kept thinking about that and thinking, well, you know, in that story, the world stood still, but Michael Keaton learned every day, which is the difference between me and Groundhog Day. I'm trying to figure the world out. So may it please the Court, Mr. Wirtz, my name is Bruce Sorda and I represent Robert Wolfe. This case is limited to CWP, and the denial by the arbitrator in the commission was wrong as a matter of law and being against the manifest way to the evidence. And as I start out here, I have to say the pop quiz, if I were able to make one, would be to ask how many cases are being decided today with Mr. Wirtz and me doing two arguments, and the answer is six, because every denial of a case like this is a denial of three cases, the second third of which there is no evidence on the table. And they're the bigger ones, the worsening condition claim and the widow's claim. And so I can understand the commission looks at the one before it. That's proper. But I think it's also proper to look at that second and third one, which are extinguished if this is denied. And the importance of that look is that the unlimited discretion or compromise that the commission has should be used. And again, going back to a denial, with that unlimited power of compromise, the commission could say, all right, on these other two cases, I have no evidence. They're the big ones. I know it's a latent progressive disease. I'm giving the guy a dollar. So the guy knows that on his case, he lost. But that doesn't mean he can't come back if the other two happen. How they take that into account, I don't think they take it into account now. I'm not really sure that they understand that or know that. And that's not a criticism of them. But I think that the farther you go up the appellate chain, the more the big picture is looked at. And that's part of the big picture. Mr. Wessor, let me interject. The arbitrator in this case, whose decision was adopted by the commission, seemed to articulate specific reasons on why he found the respondents' experts and evidence to be persuasive. He found the NIOSH readings to be persuasive based on the, quote, unquote, independence and credibility of the NIOSH opinions. What's your response to that? There are about seven, if I can remember them. The first one is that when you look at a B Reader's report, or here's deposition, the word persuasive has no business being in the commission's decision. Now, they've got to make a decision. But if you look at Dr. Meyer's depositions, who's a good man and I think a good radiologist, I like the guy personally. But when you look at the long depositions that are taken of him, you'll see nothing in there at all that is persuasive as to why he said negative and positive. There's a lot of talk about what CWP is, and I agree with it. I quote him very much for how much dust remains in the lungs and what percent of guys have CWP and autopsy. And so that part is in there. But in terms of whether the B Reading was right or not, I don't know how the word persuasive can be used in there. Because at the end he just says yes or no. The next thing is when they looked at his, they should have recognized that it was irrelevant because it was taken too soon. The burden of proof of the claimant is that he had CWP before 1F ran. That means if the X-ray is taken before that time, with the universal testimony being that you can develop it within that time, then it's too soon. That X-ray cannot say he didn't develop it. So again, on Groundhog Day, I say that. So we look at two B Readers, two B Reader radiologists, let's say. Let's make them the most qualified. And one says 1 over 0, and one says negative, 0 over 0. The first thing is that they can both be right. They can both be right. One looking at the X-ray, seeing some spots, saying he was a coal miner for 30 years. I think it's CWP. The other guy looking there seeing the very same thing and saying, you know what, I think a lot of those spots are vessels standing on end, which look like that's a spot. But I don't think it's CWP. You get the word granuloma coming in here. And a lot of times the readers for a respondent will say granulomatous disease. That's what CWP is. Because if you look up granuloma, either in Dr. Meyer's deposition or in the Merck manual, you see that what a granuloma is, is a conglomeration of macrophages. Macrophage meaning literally big eater. When the body feels something in here, a foreign body that shouldn't be there, it brings in the big eaters, the macrophages, to kill it, to get rid of it. Now that thing that's in there that it sees, it sends the macrophages to, could be from two things. One, from an infection, like histoplasmosis. A second one could be a foreign body, which could be like co-workers' pneumoconiosis, silicosis, asbestosis, or it could even be aspiration. Anything that got in there and the body reacts to. So a bee reader looks at this, and when he says zero over zero, he doesn't mean clean as a baby's butt. He just means, I don't think that what I see is from CWP. Maybe he'll say, I didn't see the tiny small round opacities. Well, if the bee reading form means anything, and you look at it, you know that everything on there can be CWP. Round, irregular, how many of them, anything on that form could be CWP. So regarding the way to be afforded to the conflicting medical opinions, the respondent has his experts, you have your experts. Are you saying the foundation's flawed? How do we find that the commission erred in giving more weight to the respondent's evidence than the claimant? How do we find that? I think, and I've never been in a position to do this action, but I think when the commission receives all the evidence, the first thing it should do is separate the sheep from the goats. Say this evidence is good evidence, this is irrelevant evidence. The x-rays that are NIOSH x-rays are irrelevant because there's still time for the guy to get it. I don't think, I don't think, see any way around it. And those should be goats. They're gone now. Then it should go over to the sheep, the ones that are left, and start weighing them. When it did the opposite, when it looked at the sheep and the goats together as one group, and then made a decision, that decision is tainted, and we can't unwind it. So in other words, to go back to your analogy, they should only look at the sheep? Yes. Okay. And NIOSH is a goat, and we disregard that because under the statute, it's within two years after last exposure. Yes. So should there be like a bright line rule that says the last day of that two years, there must be x-rays or radiographic evidence? Yes, kind of like the question, or the lead-in to your question is Bruce. You've been coming here for 25 years. I didn't hear this until yesterday or today. What happened? And the answer is, well, we respond different ways. We learn things. Mr. Works, a very good attorney, makes me think different ways, makes me look at things in different ways. And it has just formulated, just like that Sims case in 2013 about the disablement, what CWP is. It just occurred to me. I'm throwing out these NIOSH x-rays because clearly they're irrelevant. And then I say, well, wait a minute. Why stop with NIOSH? I'm not saying get rid of NIOSH because it's NIOSH. I'm saying get rid of NIOSH because it's too early. And this is a part of the case where we can make it simple. We can make it by the numbers. We can make it so it applies to everybody. And I think that the more we do that, the better these cases are going to be. We know the date of last exposure. We know the date on the x-ray. We know the date of 1F. And if there's a period... And that's two years from last exposure. Two years from the day. We know to the day. So that's back to my question. So you have radiographic evidence that was produced, let's say, 05, last exposures. 07 is the cutoff, right? You have one that's done in 06. Employer, respondent has one done in 07. The difference... Then does the commission say, oh, 06 is out. 07 carries the date. The commission must... Because you can't have it in 06 and not have it in 07. The commission has to do this. And this is why there's an order that you do this. And this is why I said both guys can be right. Well, you can't be right in my last scenario of 06 and 07... No. Unless you just can't according to the disease. I'm going to get that. And this is in the testimony. The universal testimony is a positive x-ray coupled with a sufficient history is a sufficient basis. That's the key word. That's a sufficient basis to make a positive diagnosis of CWP. A negative x-ray can never rule it out. Now, that's just a medical fact. It's a universal testimony. And like with the 2013 case, it's going to happen over and over and over and over. And hopefully someday that will be recognized. And it will provide us the bright lines we need. So let's say we have a negative x-ray. Okay. And you're saying that doesn't mean he doesn't have it. What I've heard the last day or two. The last day. Okay. Doesn't mean he has. So what is it that's going to say from your standpoint he has it? The positive x-ray. The positive. But if you have no positive x-ray, the number of years working in the coal mine, the description of the activities in the mine, exposure to dust, won't carry the date? No, and you'll never see it because when there's a negative x-ray, I'll never argue CWP. In fact, sometimes with a positive x-ray, I don't argue CWP. The commission is owed deference. And if, for instance, the commission's rule against CWP and there's one B reading after the one F that's negative, well, I think they're wrong, but they get to do that. And so I would let that go. I would not argue that. And as you know, in a number of cases, I yield on CWP. But I don't yield on CWP when the basis for their decision is wrong. My comment is not, oh, they were wrong in the way they weighed the evidence. It is that the basis for that weighing was wrong. And I think that the basis is that they relied on an x-ray to say there was no CWP that couldn't be relied on as a matter of law. Because the universal testimony is that CWP, as a latent and progressive disease, can first manifest itself any time within that two-year, one-F period. And the only x-ray they can rely on, I mean, under this scenario of insufficient basis, would be one that's done on, quote, the last day, two years from date of last exposure. That's correct. And in looking at these Blackburn cases, there's no problem with that. Any employer can get the examination, take away two years after the date of last exposure, because unless we file on the date of last exposure, it's only two years from the date of filing, and have their exam then. They can have their x-rays taken then. And then they can say, oh, these were negative. Well, wait a minute. This man's date of last exposure was August of 2002. Is that correct? I think so. So any x-ray taken after August of 2007, which is negative, would establish that he did not have COPD on the date he left employment. Is that not correct? It's a progressive disease. It can never be cured. So if you didn't have it in 2012, it follows you didn't have it in 2007. You'd have to have it in 2012 if you had it in 2007. Is that not correct? Yes. Okay. So if you don't have it in 2012, how could you possibly have had it in 2007, if it's a progressive disease? Number one, a negative x-ray in 2012 can't tell you you don't have it. Well, wait a minute. You've got two experts that say, and they've reviewed the same x-rays as the employers. Experts. Your experts say those x-rays, 2007, 2012, and I think 2013, all say CWP. His experts say those same x-rays, 07, 12, and 13, no CWP. That's a battle of the experts. The commission has to determine who they believe. If they believe his experts, then you've got a failure of proof. I will say this with as much respect as I can. I believe my search as the attorney representing one of these parties is to find guidelines wherever I can so that Mr. and which predictors we're taking and arguing about the x-rays and what's on them and not. Every time we can come to a bright line, as was done in 2013 on the CWP case, we're better off. And I'm saying there is a bright line. And I'm saying that the commission needs to look at these pieces of evidence first, one at a time. And no, this one cannot rule out CWP because there is a statute of limitations problem or a 1F problem here. It could be there. And also, the guy that gave it said it can't rule it out. So we take those and put them aside. And we find that there are some that are in. Now, CWP by x-ray is a close call. It can't get any closer than this. Then maybe, just maybe we take it in the back of our mind, you know what? There are two other cases that could follow this. Well, yeah, but wait a minute. That's an emotional argument because we know if the coal miners case is, if they're ruled against the coal miner in the underlying case, the other two cases necessarily fail. They're gone. So it's an emotional argument to say, well, if you deny the coal miner, you deny the widow. But, you know, that's not a legal argument. The legal argument is, is there sufficient proof in the record? Does the manifest weight support the notion that you established that the man had CWP? And I think Mr. Wirtz is going to stand up and say, I've got two experts that say no CWP. We're B readers. They read the x-rays. There's no CWP. And you can argue that the x-rays don't establish the negative. But at the minimum, it calls into question the veracity of the opinions given by your expert. And your proof. And I would say that the emotional side came after I expressed what I think is a step-by-step judicial look at the case. And the question is, do we want to clear this up? Do we want to have certain guidelines? Because this won't hurt the employer in the long run. Because if we have, if we recognize 1F, if we do this, all they have to do is have their x-rays taken in a timely fashion. Then my argument is gone. But until then, we need to make a rule or nothing will change. And this is very difficult to come up here and look at these case after case. And in Groundhog Day, being the first guy to stand up here, you know what that means. Mr. Wirtz, can I ask you a point of question? You wouldn't try and sway us with an emotional argument, would you? Pardon me? You wouldn't try and sway us with an emotional argument, would you? You're damn right I would. But, no. I think the question, the word there is not sway you. Influence, perhaps, make you aware, perhaps. We have the difference in the parlance of deep southern Illinois here when I'm talking about sheep from the goats. And maybe there's someone on the panel that can talk about the deep south of Illinois. But, my legal jurisprudential parlance statement would be, if the commission just takes all the evidence, throws it in a big pot and looks at it, but some of you know it shouldn't be in there. They're looking at it like a cow stares at a new gate. They can't tell what's in there. It looks confusing, but we've got to say something. Thank you. We'll have time to reply. Mr. Wirtz. May respond. May it please the court. Mr. Messore, my name's Ken Wirtz and I represent the appellee. Can you address, I mean, we're trying to hone, because you have all these cases and you have another one tomorrow. Sure. I fully understand Mr. Wirtz's argument and your response there, too. I mean, you've been responding saying, well, I've got these folks here who don't find it. Right. And it's up to the commission, blah, blah, blah, the usual magic words. But he's saying that the evidence, the sheep, the goat separation analogy, he's saying that there has to be some bright line rules you're trying all to find, and that the first thing you do is you separate those. And now are we separating them by recency? The most recent prevails? But he's saying, well, that's not necessarily if you get a negative. When do you pull the arm off the record? I love Bruce, and I mean that sincerely. We understand. And I have to share this with you. I'm going to use some of my time. I remember in a brief he wrote years ago, he likes to make these analogies, and he made an analogy to shooting a rabbit, and I forget the point he was trying to make, and you can shoot and miss it, or you can shoot and hit it, and that type of thing. And my associate that was working on the brief came to me and said, I want to show you this before we send this to the court, because I don't want to do something that's wrong. And I said, okay, let me see it. And she referred to his argument as being a harebrained scheme. And so I don't completely follow what he's saying, but let me try to answer and see if I answer your question. In this case, there were chest X-rays that were taken as far back as May of 07. Now, that's three months before this gentleman was last. Now, that was under the mine. NIOSH. Right. And in this particular case, that May 7, 2007, film was interpreted by two B readers for NIOSH, who I think we can all agree are independent. They interpreted it for screening purposes, because if it reveals black lung, then it gives certain rights to the miner. So it's not data, but they do also compile data. Right. It is data ultimately, but it does have effects on the miner. But the purpose isn't data gathering. It's actually a health reason. That film was interpreted by those two B readers as negative. That film was interpreted by Dr. Smith, one of his B readers, as revealing a Category 1 pneumoconiosis, the same interpretation for the film he gave five years later. Dr. Alexander, his other B reader, also read that 07 film and interpreted the film five years later in the same way. So what that tells us is that whatever Dr. Smith and Dr. Alexander saw in that 2007 film that was interpreted by NIOSH as negative, they're seeing the same thing in the 2012 film. Let me interject a question. I believe Mr. Lesseur argued that the opinions of the NIOSH B readers were irrelevant. Well, I think they're relevant. I'm sorry. That's what he was arguing. I think they're relevant for the reason I gave, because it goes to their B readers, I don't want to say credibility, but the way you would give their opinion, because they're reading that NIOSH film that was interpreted by NIOSH as negative, as positive, just like they're reading the film five years later. It occurs to me, if he's positive on May the 7th, Correct. then he's obviously positive in August of 07. It should not go away. It has to follow. It doesn't go away. Right. It's incurable. Right. If the NIOSH reader were negative and both of his experts were negative, now the question becomes would the May film be relevant as to his condition on August the 7th? If all of them were negative. Well, if all of them were negative. Well, if all of them were negative on May the 7th, that doesn't mean he didn't have CWP in August of 07. So now you look to the x-rays post-August 07 to determine whether he's positive or negative. So my question is, he keeps saying the NIOSH film is irrelevant. It only became relevant because his two experts said it was positive, and it became relative to the credibility of their opinion. Right. And I will refer you to the record at page A33, which is the conclusion page for the arbitrator's findings. And what he says there in part is Dr. Smith's interpretations, he doesn't mention Alexander, but he could have included Alexander, of the chest x-ray from May 7, 2007 to March 12, 2012 were identical. Given the chest films read by NIOSH as negative in 2007, the changes seen by Dr. Smith were not pneumoconiosis. I'd argue that his opinion should be given less weight because of that. But I think that's the point you were bringing up. If we look here at the films that were just taken after the date of last exposure, or the interpretations for films taken after the date of last exposure, you have four positive readings by B readers and four negative readings. So, I mean, that's, well, I don't have a coin, but that's, you know, a coin toss. That's not preponderance of the evidence. If what you're looking at here comes down to simply flipping a coin, I mean, that's, you know, it's that close a call. That's not a preponderance of the evidence. Mr. Wasore has in the past said, well, as many as 50% could have pathologic evidence. That's a possibility. But keep in mind, that means that the possibility is that his B readings are wrong. He may be in that 50% that doesn't have pathologic evidence. I mean, it cuts both ways. So you're saying that at that point he has not met his birth? Right. I mean, it's a preponderance of the evidence. Right. Okay. And since 1F has apparently now come up more than once, and it's implicated. So let's stay with your thing, because I'm simplifying here. I have to follow it very carefully. Is this where the $1 comes in? Because I'm intrigued by that one, too. Because we have collateral effects of finding a 50-50. We have severe collateral effects from a claimant's family. More so the commission than you, but yes. I mean, a denial of a claim, any worker's compensation or occupational disease claim may have implications. And the first one that comes to mind is if you find the gentleman's accident didn't cause his injury, then obviously he's not going to be able to come back later under Section 12H and ask for an increase in permanency if the claim's not compensable. So there are ramifications in every case if there's a denial of the claim. Correct. But we have just set up a scenario where it's a coin flip. Right. So that's not, you know, some of these other cases we're hearing. I mean, you're talking about totally evenly balanced evidence, right? Well, I don't. Phenographic evidence. I'm not saying that's the case here. But if you have a scenario that is simply a flip of the coin, I didn't cite it in this case. But, excuse me, the Supreme Court has said in Ritter, I think, I can't remember, I don't have the site now, that where you have two equally possible outcomes, that that's not a preponderance of the evidence. A preponderance is just a little bit more, let's say. Oh, we understand that. But we, I'm just trying to figure out where the dollar comes from. I think he's arguing. That's really an equity issue. Right. I think he's arguing, if you just award my client a dollar, then he'll have the ability to file a 19-H petition, or his widow would have, you know, eventually, if she survives. Because if. Because if you deny it. If your guys are wrong, or gals are wrong, and he really has it, he's going to die from it, probably. Well. He's going to be contributing. It will be found, autopsy evidence. Yeah. To say that he would die from it, I would say, is a pretty big stretch. Simple pneumoconiosis, once the exposure ceases, I think all pulmonologists agree, does not typically progress. In fact, in this case, since Dr. Hauser was a witness, I usually ask him that, and it's probably in his testimony that 95% of the cases don't progress, and I suspect he said it, Mr. Walsh, I couldn't say it was. So, to say that they would die from it, it's a bit extreme. So, and that would mean, of course, if he did die, and a death claim was filed, they would still have to prove causation with the death, which is not a given by any means, even if you have black lung, and this court has affirmed denials of death claims, where somebody was awarded 10% of the man. So, I mean, people die from all causes. But can I, did I answer your question? Well, I think I'm getting close to understanding the argument. Is there something more that I can do to help? You might trigger something. Go right ahead. Well, in regard to 1F, since that keeps coming up, I pulled it out just so I could read it. 1F is a prequisite, I don't know if that's the right word, it's a requirement that the claimant must meet for his claim to go forward. It's not a requirement for the employer. And I'll just read it. No compensation shall be payable for or on account of an occupational disease unless disablement, as herein defined, occurs within two years after the day of last exposure to the hazards of the disease. That's a requirement for the claimant. It's not a requirement that the respondent show that there's no disablement within two years. It's a required element of the claimant's case. Ms. Ressour would like to make it a requirement of me, but that's not what the statute says. So I guess I take exception to the argument to that extent. You're saying it's not a burden shifting? It is a burden solely on the claimant. Yeah, but it's not permissible to be burden shifting. It doesn't apply. It doesn't shift the burden. Are there any? Did you think of something? No, I'm just clarifying. Is there anything else? It's obviously the position of the appellee that there was sufficient evidence in the record to support the denial. I think in the conclusions from A33 and 34 of the record of Arbitrator Nowak, that he sets forth how he arrived at his weighing of the evidence, and I would ask that it be affirmed. What about the notion that we only look to the films from within the F-1 period? Well, are you asking in general or about this case? I'm asking about the argument Mr. Ressour made previously that we not look at the relevance earlier to last exposure films. Let me answer it this way. It is correct that you could develop pneumoconiosis late in your career in mining. There's no question about that. So the most relevant x-rays as to the individual's condition today would be the later x-rays. No doubt about that. In this particular case, because of the set of facts we have, where those earlier films were interpreted by NIOSH as negative and their expert interprets them as positive, the same way they interpreted those later films, that goes to the weight to be given their opinion. But in general, in answer to your question, I don't believe any of my experts would say that if you do not have, using this gentleman as an example, evidence of black lung in 2005, two years before he retired, that that rules out that he has it in 2007. I agree with that. Did I answer your question? Yes. Thank you. You know, I think the most probative, if you want to know what the gentleman is today, you probably want to look at the last studies performed on him. And that would be true also of the other tests we have performed, his spirometry, blood gases. You would want the latest valid test to look at to determine impairment as well. Now did you think of what you were going to ask? No, no. That's fine. I might in reply. I don't think there are any further questions from the bench. Thank you. Thank you. Thank you. Again, trying to put guide rails on things, things we can know when we're developing, things we can depend on for consistency. When you look at this case, it's not just the arguments we've had so far today. If you look at the evidence, not only did they put in things which shouldn't have been there in my opinion, but we've trodden that ground. The second thing is they left out X-rays that should have gone in. Dr. Whitehead is a radiologist B-reader. He read the X-ray for Dr. Hauser. He's not in there. For all we know, they didn't look at him. Dr. McFarland, a long-time treater, he's not a B-reader, but he looked at many X-rays and he put fibrosis, fibrosis, fibrosis, severe fibrosis. So he's not a B-reader. He doesn't speak in language of the B-reader, but we know that CWV is fibrosis. Those were all left out too. They had a bad pile of evidence, and I'm going to say that in an academic way they didn't care or they didn't know, and I can say that without being pejorative. But when I look at this pile of evidence and I judge the pile of evidence, I say, number one, there's stuff in there that shouldn't be, but if I'm not positive of that, I say there's definitely stuff that should have been in it and it wasn't. So I question the ability of the commission or the knowledge of the commission to decide what should be in that pile. Sometimes, and it came up when I was first here, the question of NIOSH and what they're here for, and you'll read in a brief, oh, they're here for the benefit of the miner. That's a load of baloney. A government, can you imagine a government agency saying, oh, we're here to screw the company and to help the worker? They couldn't do that. Even a good Republican wouldn't agree with that. They're neutral. What do you mean there's no such thing as a good Republican? Who said that? No. Be careful. This is being recorded. I'm sorry. Remember that. I wasn't taking a stance. I just thought I heard something. But the point is, they're neutral. They're not here to help the miner. Certainly, their decision, if it's that the guy has a positive X-ray, he may be able to transfer to a less dusty area. But the purpose also is to save money for the company by making it safer. Because under our idea of work comp, we put the burden on the employer, not the general taxpayer, because they're the ones who are in the best position to make it safe, which is actually good for them. So when somebody says a truly independent NIOSH peer reader, not so. I could also tell you that the readers of NIOSH X-rays, and this isn't in the evidence, so you can ignore it completely, they're paid quite little for their readings, which is why only a few of them do it. And they know that they're being counted because the NIOSH has a certain amount that they think it should be. And if the reader comes in with too few or too many, they get somebody else. So what my point is, a NIOSH peer reader is just like the other peer readers. And in terms of peer readers, there's only one reason that a pulmonologist becomes a peer reader or radiologist. To make money. They don't use it for treating. That's the only thing they use it for. There are only about 500 of them in the country. And they're only there because of first federal black lung. Well, not at all because of Illinois when you look at the country. But they do it to make money. The only one I know who didn't was a guy named Dr. Sued, who was here in 2004. He's a very young pulmonologist and he's a research guy. And I went to talk to him because I needed an expert. And he's a bee reader, but he didn't read for anybody. He did it out of just academic curiosity. He reads now, but it's 10 years later. He's figured it out. Anyway, I can prove something. Now, this is not an emotional argument, but I can prove something about us being here. Think about it. It's an x-ray only case, which means, as you know, you can take judicial notice that at least 80% of this kind of case is settled. It never goes to trial. And it's settled for 5%, about 15,000. This one could have been the same way, but it wasn't. It was taken all up to appellate court. Now, I remember from looking through my notes, and I'm one of the only plaintiff type lawyers who keeps a log of what he does on the cases. And I don't care whether it's a 5% case or a total permanent. It takes about 250 to 300 hours to get here. And it's probably more than that if I was getting paid for them. So you've got to ask, why is it that this employer brings this case to here? They could have settled for $15,000, and now they're paying added up. I don't know how much Mr. Wertz makes, $60,000, $70,000. They're not doing it to save money. Unless it's to save money on those other two cases that are going away now. Or to keep the boot on the neck of the miner. I don't know which. But it's not logical. Does that decide anything? No. But it's part of this whole pile of stuff that doesn't decide anything in and of itself. But something to take into consideration. Counsel, the red light has come on. And you've been very patient, and I thank you. I ask that the case be remanded to view only the positive and all of the positive. I mean all of the relevant. Thank you. Thank you, Counsel Bolt, for your enlightening presentations this morning. This matter will be taken under advisement and written disposition shall issue.